EXHIBIT

A

This Agreement made the 3rd day of November, 1998

BETWEEN:

        THE LOTTERY CHANNEL, INC. ,
        a corporation incorporated under the laws of the
        state of Delaware, U.S.A. and having offices at
        2300 Star Bank Center
        Cincinnati, Ohio, U.S.A.
        45202

        (hereinafter referred to as the "Purchaser")

AND:

        BINGO, INC. ,
        a corporation incorporated under the laws
        of Anguilla, having offices at
        The Hansa Bank Building, Landsome Road
        The Valley, Anguilla, B.W.I.

AND:

        STRAUSS & TROY,
        a legal profesional association, having offices at
        2100 PNC Center
        201 East Fifth Street
        Cincinnati, Ohio
        45202

        (hereinafter referred to as the "Escrow Agent")

WHEREAS:

A.    Bingo, Inc. is the registered holder of the second-level domain name "lottery.com" under the InterNIC internet domain name registration service provided and coordinated by Network Solutions, Inc. and is desirous of selling, assigning, transferring and relinquishing to the Purchaser all of its right, title and interest in and to that domain name and the registration thereof, on those terms and conditions hereinafter set forth;

B.    The Purchaser is engaged in the business of providing to the public, by means, inter alia, of television and the internet, information concerning various lotteries and, for the purpose of facilitating customer access thereto via the internet, wishes to use "lottery.com" as the domain name for a website to be established for the provision of such information and, accordingly, is desirous of purchasing from Bingo, Inc. and of having assigned, transferred and relinquished to it all of the right, title and interest of Bingo, Inc. in and to the second-level domain name "lottery.com" and the registration thereof, on those terms and conditions hereinafter set forth;

C.    The Purchaser is currently a private corporation but is intent upon issuing additional common shares and registering all of its common shares under the securities laws of the United States of America, so as to permit those shares to be publicly traded in the United States of America;

NOW, THEREFORE, THIS AGREEMENT WITNESSES THAT:

## 1.    REPRESENTATIONS AND WARRANTIES OF BINGO, INC.

1.1    **Rights in the Domain Name.**  On October 13, 1998 Bingo, Inc. entered into a domain name registration agreement with Network Solutions, Inc. for the second-level domain name "lottery.com" (the "Domain Name"), in the form (version 4.0) then required by Network Solutions, Inc. (the "Domain Name Registration Agreement").  As the current registrant of the Domain Name, Bingo, Inc. is the legal and beneficial holder of all such rights, title and interests in and to the Domain Name as were created by and/or may exist by virtue of the Domain Name Registration Agreement, save and except those rights and interests in and to the Domain Name as were therein and thereby reserved in favor of Network Solutions, Inc, and is the legal and beneficial holder of all such other rights, title and interests in and to the Domain Name as may exist at common law, if any, and Bingo, Inc. holds all such rights, title and interests free and clear of any and all other liens, claims, security interests, charges, options and encumbrances of whatsoever kind and nature.  The Domain Name is not subject to any litigation or trademark dispute.  To the best of the knowledge, information and belief of Bingo, Inc., use of the Domain Name by the registrant thereof does not and will not infringe upon any rights of any third-party.

1.2    **Capacity and Authority.**  Bingo, Inc. has all necessary corporate power, authority and capacity to enter into this Agreement and to assign, transfer and relinquish to the Purchaser all of its right, title and interest in and to the Domain Name and the registration thereof and to otherwise perform its obligations hereunder.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby has been duly and validly authorized by all necessary corporate action on the part of Bingo, Inc. and this Agreement constitutes a valid and binding obligation of Bingo, Inc.  Bingo, Inc. is not a party to, bound by or subject to any agreement, instrument, statute, regulation, order, judgment, decree or law which would be violated, contravened or breached by or under which any default would occur as a result of the execution and delivery by Bingo, Inc. or the performance by Bingo, Inc. of any of the terms of this Agreement.

## 2.    REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

2.1    **Capacity and Authority.**  The Purchaser has all necessary corporate power, authority and capacity to enter into this Agreement and to purchase and acquire from Bingo, Inc. all of its right, title and interest in and to the Domain Name and the

- 3 -

registration thereof and to otherwise perform its obligations hereunder. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby has been duly and validly authorized by all necessary corporate action on the part of the Purchaser and this Agreement constitutes a valid and binding obligation of the Purchaser. The Purchaser is not a party to, bound by or subject to any agreement, instrument, statute, regulation, order, judgment, decree or law which would be violated, contravened or breached by or under which any default would occur as a result of the execution and delivery by the Purchaser or the performance by the Purchaser of any of the terms of this Agreement.

**2.2    No Consents Required.** No consent or approval of, notice to or filing with any person, governmental authority or any other entity is required in connection with the execution and delivery of this Agreement by the Purchaser or the consummation by the Purchaser of any of the transactions contemplated hereby.

**2.3    Awareness of Rights being Purchased.** The Purchaser has read the form of domain name registration agreement (version number 4.0) currently required by Network Solutions, Inc. as the provider and coordinator of the InterNIC internet domain name registration service and understands fully the nature and extent of and the limitations upon the rights, title and interests which arise thereunder in favor of a registrant of a domain name and, accordingly, is fully aware of the nature and extent of and the limitations upon those rights, title and interests arising out of the Domain Name Registration Agreement to be conveyed to the Purchaser by Bingo, Inc. hereunder.

**2.4    Capital Stock.** The issued capital stock of the Purchaser consists of 7,775,695 common shares without par value, which have been issued at an average price of Fifteen United States Dollars (U.S.$15.00) per share.

**2.5    Issuance of Shares.** At the time of delivery to Bingo, Inc. of the share certificates representing the same pursuant to Section 9.2 hereof, each of the Shares to be issued to Bingo, Inc. pursuant to Section 3.2 hereof will be validly issued, fully paid and non-assessable and, at the time of issuance of any additional Shares required to be issued to Bingo, Inc. pursuant to Section 3.3 hereof, all such additional Shares will be validly issued, fully paid and non-assessable.

## 3.    PURCHASE AND SALE

**3.1    Purchase and Sale.** Based and relying upon the representations and warranties of Bingo, Inc. set forth in Section 1 hereof, the Purchaser hereby agrees to purchase from Bingo, Inc. the Domain Name and all of the right, title and interest of Bingo. Inc. therein and thereto and in and to the registration thereof, at and for a price of **Two Hundred Thousand United States Dollars (U.S.$200,000.00)**, subject to adjustment as provided in Section 4 hereof (such price, as adjusted from time to time, if at all, being hereinafter referred to as the "Purchase Price") and, based and relying upon the representations and

warranties of the Purchaser set forth in Section 2 hereof, Bingo, Inc. hereby agrees to sell, assign, transfer and relinquish to the Purchaser, at and for the Purchase Price, the Domain Name and all of the right, title and interest of Bingo, Inc. therein and thereto and in and to the registration thereof, free and clear of all liens, claims, security interests, charges, options and encumbrances, all on those terms and conditions hereinafter specified.

**3.2    Share Consideration.** In satisfaction of One Hundred and Twenty-Five Thousand United States Dollars (U.S.$125,000.00) of the Purchase Price, the Purchaser shall issue to Bingo, Inc., as fully paid and non-assessable, Eight Thousand Three Hundred and Thirty-Three (8,333) common shares in the capital stock of the Purchaser (such shares, together with any shares issued to Bingo, Inc. pursuant to Section 3.3 hereof being herein referred to as the "Shares").

**3.3    Anti-Dilution.** If, at any time while the Purchaser remains a private corporation, the Purchaser issues any common shares in its capital stock, the effect of the issuance of which is to reduce the average price at which common shares in the capital stock of the Purchaser have then been issued to less than Fifteen United States Dollars ($15.00) per share, the Purchaser shall, forthwith after the issuance of such shares, issue to Bingo, Inc., as fully paid and non-assessable, that number of common shares in the capital stock of the Purchaser which is equal to U.S.$125,000.00 divided by the average price at which common shares in the capital stock of the Purchaser have then been issued, less 8,333 shares and less such number of shares, if any, as may theretofore have been issued to Bingo, Inc. pursuant to this Section 3.3, and shall forthwith deliver to Bingo, Inc. certificates in its name representing the shares so issued.

**3.4    Monetary Consideration.** In further satisfaction of the Purchase Price the Purchaser shall pay to Bingo, Inc., at those times and in the manner hereinafter provided, the sum of One-Thousandth of One United States Dollar (U.S.$0.001) for each internet user connection ("visit") made to the internet website to be established by the Purchaser in connection with its business, as hereinafter provided, and having "lottery.com" as its domain name (the "Domain Name Website"), from and after January 1, 1999 and until such time, if any, as the rights, title and interests in and to the Domain Name being transferred pursuant to this Agreement are re-acquired by Bingo, Inc. pursuant to Section 4.1 hereof, excluding any and all "visits" received by the Domain Name Website from employees, agents or representatives of the Purchaser. The number of "visits" received by the Domain Name Website shall be determined by a recognized independent and reliable provider of such statistics specified by the Purchaser and approved by Bingo, Inc., such approval not to be unreasonably withheld. On or before the tenth United States business day following the end of each calendar quarter, the Purchaser shall report to Bingo, Inc. in writing the number of "visits" received by the Domain Name Website in that quarter in respect of which payment is required to be made and, based thereon, shall pay to Bingo, Inc. the applicable portion of the balance of the Purchase Price, by wire-transferring the amount thereof to the account of Bingo, Inc. in accordance with the following instructions:

| To: | Barclays Bank Plc |
| --- | --- |
| | 75 Wall Street |
| | New York |
| | NY, USA. |
| ABA Number: | 026002574 |
| For Credit To: | Barclays Bank Plc |
| | Anguilla |
| | British West Indies. |
| Account Number: | 28019840265 |
| For Further Credit to the account of: | Bingo, Inc. |
| Account Number: | 134 – 7256 |
| Advising: | Donald Curtis |
| | Tel. (264) 497-3800 |

## 4.    RIGHT OF RE-ACQUISITION

4.1    **Rights.**    Provided that Bingo, Inc. has not then been paid an aggregate of U.S.$75,000.00 pursuant to Section 3.4 hereof and provided that the common shares of the Purchaser have not then been registered under the securities laws of the United States of America so as to permit such shares to be publicly traded in the United States, Bingo, Inc. shall be entitled, on the second anniversary of the date specified in Section 9.2 hereof for delivery of documentation by the Escrow Agent and on each subsequent anniversary date thereof (or, if such date shall not be a United States business day, on the next succeeding United States business day), at its sole election, by notice in writing, to require the Purchaser to either:

(a)    transfer, assign and relinquish to Bingo, Inc. the Domain Name and all of the right, title and interest of the Purchaser therein and thereto and in and to the registration thereof, including any and all trademark and/or servicemark rights which may by then have arisen in favor of the Purchaser at common law or by statute as result of its use of the Domain Name; or

(b)    continue to make payments in respect of qualifying "visits" received by the Domain Name Website at that rate and at those times and in the manner specified in Section 3.4 hereof until such time as the common shares of the Purchaser have been registered under the securities laws of the United States so as to permit such shares to be publicly traded in the United States or Bingo, Inc. has been paid in aggregate U.S.$75,000.00 in respect of qualifying "visits" received by the Domain Name Website, whichever is later, notwithstanding that Bingo, Inc. may thereby

be paid in aggregate in excess of U.S.$75,000.00 in respect of qualifying "visits" received by the Domain Name Website:

4.2    **Procedure.** In the event that Bingo, Inc. elects to require the Purchaser to transfer, assign and relinquish to it the Domain Name and the right, title and interest therein and thereto acquired by the Purchaser, Bingo, Inc. shall return to the Purchaser for cancellation all of the share certificates theretofore issued and delivered to Bingo, Inc. in respect of the Shares and shall be entitled to retain all amounts theretofore paid by the Purchaser in respect of qualifying "visits" received by the Domain Name Website, and the Purchaser shall complete, execute before a notary public and deliver to Bingo, Inc. a registrant name change agreement in the form then specified by the administrator of the InterNIC internet domain name registration service and shall pay to Bingo, Inc., in the manner specified in Section 3.4 hereof, the amount accrued, at the rate of U.S.$0.001 per "visit", in respect of qualifying "visits" received by the Domain Name Website during the calendar quarter in which such election is made by Bingo, Inc.

4.3    **Precedence.** Notwithstanding that the registrant name change agreement to be entered into between Bingo, Inc. and the Purchaser with respect to the Domain Name in order to give effect to this Agreement (the "*Registrant Name Change Agreement*") will specify that Bingo, Inc. desires to and does relinquish unto the Purchaser all of its interests in the registration of the Domain Name, the provisions of this Section shall take precedence over the provisions of the Registrant Name Change Agreement and Bingo, Inc. shall be and continue to be entitled to, in the manner provided in this Section, require the Purchaser to transfer, assign and relinquish to it the Domain Name and the right, title and interest of the Purchaser therein and thereto.

## 5.    COVENANTS OF THE PURCHASER

5.1    **Covenants.** The Purchaser covenants and agrees with Bingo, Inc. that:

(a)    the Purchaser will use its reasonable commercial best efforts to create, popularize and exploit the Domain Name Website;

(b)    the Purchaser will not assign or encumber in any way the Domain Name or any of the rights, title or interests of the Purchaser therein and thereto so long as Bingo, Inc. has the right to re-acquire the same;

(c)    the Purchaser will, forthwith after completion of the purchase and sale contemplated hereby, enter into a domain name registration agreement with Network Solutions, Inc. in the form required by Network Solutions, Inc. as the administrator of the InterNIC internet domain name registration service and will, so long as Bingo, Inc. has the right to re-acquire the rights, title and interests in and to the Domain Name being sold, transferred, assigned and relinquished to the Purchaser hereby, pay all such fees and take all such other actions as may be required to maintain that domain name registration agreement in full force and

effect and to maintain, to the fullest extent possible, all rights, title and interests of the Purchaser in and to the Domain Name and the registration thereof and will refrain from taking any action or actions which would in any way diminish any of the rights, title or interests of the Purchaser in or to the Domain Name or the registration thereof, whether arising out of that domain name registration agreement or otherwise; and

(d)    the warranties and representations of the Purchaser contained herein will be true and correct at the time the documentation specified in Section 9.2 hereof is delivered to Bingo, Inc., as if made at and as of that time.

## 6.    COVENANT OF BINGO, INC.

6.1    **Truth of Representations:** Bingo Inc. covenants and agrees with the Purchaser that the warranties and representations of Bingo, Inc. contained herein will be true and correct at the time the documentation specified in Section 9.2 hereof is delivered to the Purchaser, as if made at and as of that time.

## 7.    CONDITIONS PRECEDENT TO THE PERFORMANCE BY THE PARTIES OF THEIR OBLIGATIONS UNDER THIS AGREEMENT

7.1    **Purchaser.** The obligations of the Purchaser to complete the purchase contemplated hereby shall be subject to the satisfaction of, or compliance with, at or before the time specified in Section 9.2 hereof for delivery of documentation by the Escrow Agent, each of the following conditions precedent (each of which is hereby acknowledged to be inserted for the exclusive benefit of the Purchaser and may be waived by the Purchaser in whole or in part):

(a)    **Truth and Accuracy of Representations of Bingo, Inc.** Save as provided herein, the representations and warranties of Bingo, Inc. made in Section 1 hereof shall be true and correct in all material respects as at the time specified in Section 9.2 hereof for delivery of documentation by the Escrow Agent and with the same effect as if made at and as of that time.

(b)    **Documentation.** Bingo, Inc. shall have delivered to the Escrow Agent, subject only to the provisions of this Agreement, the following documentation:

(i)    a completed registrant name change agreement in the form then required by Network Solutions, Inc., specifying the Purchaser as the new registrant for the Domain Name and duly executed by a authorized officer of Bingo, Inc. before a notary public;

(ii)    a certified copy of the resolutions of the directors of Bingo, Inc. authorizing the sale of the Domain Name and the relinquishment and transfer and assignment of all of the right, title and interest of Bingo, Inc. therein and

thereto and in and to the registration thereof on the terms specified in this Agreement; and

(iii) a certificate from the President of Bingo, Inc., made as of the time specified in Section 9.2 hereof for delivery of documentation by the Escrow Agent, certifying that, to the best of his knowledge, information and belief (after due enquiry), all of the representations and warranties of Bingo, Inc. contained in this Agreement are true and correct in all material respects;

7.2 **Bingo, Inc.** The obligations of Bingo, Inc. to complete the sale, transfer and assignment contemplated hereby shall be subject to the satisfaction of, or compliance with, at or before the time specified in Section 9.2 hereof for delivery of documentation by the Escrow Agent, each of the following conditions precedent (each of which is hereby acknowledged to be inserted for the exclusive benefit of Bingo, Inc. and may be waived by Bingo, Inc. in whole or in part):

(a) **Truth and Accuracy of Representations of the Purchaser.** Save as provided herein, the representations and warranties the Purchaser made in Section 2 hereof shall be true and correct in all material respects as at the time specified in Section 9.2 hereof for delivery of documentation by the Escrow Agent and with the same effect as if made at and as of that time.

(b) **Documentation.** The Purchaser shall have delivered to the Escrow Agent, subject only to the provisions of this Agreement, the following documentation:

(i) a share certificate representing 8,333 common shares in the capital stock of the Purchaser registered in the name of Bingo, Inc. at its address first set out above;

(ii) a certified copy of resolutions of the directors of the Purchaser authorizing the purchase of the Domain Name and the acquisition of all of the right, title and interest of Bingo, Inc. therein and thereto and in and to the registration thereof on the terms specified in this Agreement; and

(iii) a certificate from a senior officer of the Purchaser, made as of the time specified in Section 9.2 hereof for delivery of documentation by the Escrow Agent, certifying that, to the best of his or her knowledge, information and belief (after due enquiry), all of the representations and warranties of the Purchaser contained in this Agreement are true and correct in all material respects.

7.3 **Breach of Condition Precedent.** If any of the conditions set forth in Sections 7.1 or 7.2 hereof shall not be performed or satisfied by the time specified in Section 9.2 hereof for delivery of documentation by the Escrow Agent and shall not be then have been waived by the party entitled to do so, this Agreement shall be null and void.

- 9 -

## 8.  SURVIVAL OF REPRESENTATIONS AND WARRANTIES

8.1    All representations, warranties, covenants and agreements made herein by each of the parties hereto shall survive the execution and delivery of those documents of title contemplated hereby and the issuance of the Shares and such other actions as may from time to time be taken in satisfaction of the Purchase Price.

## 9.    ESCROW

9.1    Delivery of Documents to the Escrow Agent.  On or before Friday, November 6, 1998, Bingo, Inc. shall deliver to and deposit with the Escrow Agent those documents and instruments specified in Section 7.1(b) hereof and the Purchaser shall deliver to and deposit with the Escrow Agent those documents and instruments specified in Section 7.2(b) hereof.

9.2    Delivery of Documents.  The Escrow Agent agrees to hold any and all documents and instruments so delivered to it by Bingo, Inc. and the Purchaser in escrow and, at 4:00 p.m. Eastern Standard Time on Friday, November 6, 1998:

(a)    if the Escrow Agent shall then have received from Bingo, Inc. all of those documents and instruments specified in Section 7.1(b) hereof and shall then have received from the Purchaser all of those documents and instruments specified in Section 7.2(b) hereof and shall not then be prevented from doing so by an order of a court of competent jurisdiction, deliver to Bingo, Inc., by a reputable international document courier, those documents and instruments which the Escrow Agent has received from the Purchaser and deliver to the Purchaser, by hand, those documents and instruments which the Escrow Agent has received from Bingo, Inc.; or

(b)    if the Escrow Agent shall not then have received from Bingo, Inc. all of those documents and instruments specified in Section 7.1(b) hereof and/or shall not then have received from the Purchaser all of those documents and instruments specified in Section 7.2(b) hereof and shall not then be prevented from doing so by an order of a court of competent jurisdiction, return to Bingo, Inc., by a reputable international document courier, those documents and instruments, if any, which the Escrow Agent has received from Bingo, Inc. and return to the Purchaser, by hand, those documents and instruments, if any, which the Escrow Agent has received from the Purchaser.

9.3    Indemnity.  In consideration for the Escrow Agent agreeing to so act as escrow agent as aforesaid, Bingo, Inc. and the Purchaser hereby jointly and severally covenant and agree, from time to time and at all times hereafter, to save and defend, keep harmless, and fully indemnify the Escrow Agent and its successors and permitted assigns and its members and their heirs, executors, administrators, personal representatives, successors and permitted assigns from and against all loss, costs, charges, suits, demands, claims,

damages and expenses which they or Escrow Agent may at any time or times hereafter bear, sustain, suffer or be put unto for or by reason of or on account of the Escrow Agent so acting as escrow agent hereunder or anything in any manner relating thereto or by reason of the Escrow Agent complying in good faith with the terms set forth herein. Without restricting the foregoing indemnity, it is further jointly and severally agreed by Bingo, Inc. and the Purchaser that, in case proceedings should hereafter be taken in any court respecting any of the documents or instruments delivered to the Escrow Agent hereunder, the Escrow Agent shall not be obligated to defend any such action or submit its rights to such court until the Escrow Agent shall have been indemnified by other good and sufficient security, in addition to the aforesaid indemnity against its costs of such proceedings.

### 10. GENERAL

10.1  **Notices.** Any notice or other writing required or permitted to be given hereunder or for the purposes hereof shall be sufficiently given if delivered to the party to whom it is given or mailed, by prepaid registered mail, addressed to such party at its address set forth on the first page hereof, or at such other address as the party to whom such writing is to be given shall have last notified to the party giving the same in the manner provided in this Section 10.1. Any notice mailed as aforesaid shall be deemed to have been given and received on the fifth business day next following the date of its mailing unless at the time of mailing or within five business days thereafter there occurs a postal interruption which could have the effect of delaying the mail in the ordinary course, in which case any notice shall only be effectively given if actually delivered. Any notice delivered to the party hereto to whom it is addressed shall be deemed to have been given and received on the day it was received, provided that if such day is not a business day then notice shall be deemed to have been given and received on the business day next following such day.

10.2  **Entire Agreement.** This Agreement constitutes the entire agreement between the parties hereto and supersedes all prior agreements and understandings, oral and written, by and between any of the parties hereto with respect to the subject matter hereof.

10.3  **Further Assurances.** The parties hereto shall with reasonable diligence do all such things and provide all such reasonable assurances as may be required to consummate the transactions contemplated hereby, and each party hereto shall provide such further documents or instruments required by the other party as may be reasonably necessary or desirable to effect the purpose of this Agreement and carry out its provisions whether before or after the closing.

10.4  **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the state of Ohio, U.S.A.

10.5  **Headings.** The headings in this Agreement are inserted for convenience of reference only and shall not affect the interpretation hereof.

- 11 -

10.6   **Enurement.**  This Agreement and each of the terms and provisions hereof shall enure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns.


IN WITNESS WHEREOF the parties hereto have duly executed this Agreement as at the day and year first set out above.


**THE LOTTERY CHANNEL, INC.**                    **BINGO, INC.**

per: _____              per: _____
      Authorized Signatory                           Authorized Signatory


**STRAUSS & TROY**

per: _____
      Authorized Signatory

EXHIBIT

*B*

# Bingo, Inc.
Registered in Anguilla No. 4605

By:  Federal Express
     e-mail to (rwa@lottery.com)
     Fax to (513) 721-6035

Thursday, November 2, 2000

**THE LOTTERY CHANNEL, INC.**
425 Walnut Street – Suite 2300
Cincinnati, Ohio
45202

**Attention:** Roger W. Ach, II
_____Chairman and CEO

Dear Sirs:

We are in receipt of your letter of November 1, 2000, in which, as we understand it, you request that we postpone for 45 days such action as we become entitled to take on November 6, 2000 under Section 4.1 of the agreement between ourselves, yourselves and Strauss & Troy dated November 3, 1998 (the "Purchase Agreement"), in order to provide you time to complete negotiations and mutual due diligence reviews with Bingo.com, Inc., aimed at the combination, in some manner, of your two organizations. We are prepared, on appropriate terms and conditions, for the sole purpose of allowing you time to complete negotiations and due diligence reviews with Bingo.com, Inc. and expressly not for the purpose of providing additional time for any registration statement filed in respect of your common stock to become effective, to accede to such request.

Accordingly, we agree to amend the Purchase Agreement by deleting from Section 4.1 thereof the words "on the second anniversary of the date specified in Section 9.2 hereof for delivery of documentation by the Escrow Agent and on each subsequent anniversary date thereof" and substituting therefor the words "on December 21, 2000 and on the sixth day of November in each year thereafter", provided and expressly subject to your agreement that:

1.   you will notify us, in the manner provided for in the Purchase Agreement, immediately upon any registration statement being filed in respect of your common stock and, if, at any time during the period commencing on the date such amendment becomes effective and ending on December 21, 2000, a registration statement is filed in respect of your common stock, such amendment shall be and shall be deemed to have been void ab initio and shall be and be deemed to have been of no effect;

Mailing Address: PO Box 727, The Valley, TV1 02P, Anguilla, British West Indies
Registered Office Address: The Hansa Bank Building – 1ˢᵗ Floor, Landsome Road, The Valley, Anguilla, British West Indies
Tel. 264 497 3800   Fax. 264 497 3801

Bingo, Inc.
Registered in Anguilla No. 4605

2.  we shall be entitled on December 21, 2000, or at any time after receipt by us of
notice that a registration statement has been filed in respect of your common stock,
to take any and all such action under the Purchase Agreement as we would, but for
such amendment, have been entitled to take on November 6, 2000, and that any
action taken by us on December 21, 2000, or after our receipt of notice that a
registration statement has been filed in respect of your common stock, shall have the
same effect as if we had taken the same on November 6, 2000; and

3.  any agreement which you may conclude with Bingo.com, Inc. with respect to the
combination of your two organizations shall be made expressly subject to receipt by
yourselves and Bingo.com, Inc. of approval thereof in writing from us, the provision
or withholding of which shall be and remain entirely within our sole discretion.

Please indicate your agreement to amend the Purchase Agreement on and subject to the
above terms and conditions, by signing in the space provided at the foot off this letter and
returning it to us by fax at (264) 497-3801 and (604) 734-7982, no later than noon,
Pacific time, on November 3, 2000, with the signed original to be delivered to us by
courier forthwith thereafter.  This letter, when fully executed, will constitute the
amendment to the Purchase Agreement referred to herein.

Very truly yours,

BINGO, INC.

Tryon M. Williams
Director & Authorized Signatory

CONFIRMED AND AGREED TO

this  3  day of November, 2000:

THE LOTTERY CHANNEL, INC.

by:

~~Roger W. Ach, II, President~~
Carol A. Meinhardt
Director & Authorized Signatory

2 of 2





December 20, 2000

Bingo, Inc.
P.O. Box 727
The Valley, TVI 02P
Anquilla, British West Indies

Attn: Tryon M. Williams, Director

Dear Mr. Williams:

By a letter agreement dated November 2, 2000 between Bingo, Inc. and The Lottery Channel, Inc. ("Lottery"), Bingo, Inc. and Lottery agreed to certain amendments to the November 3, 1998 Purchase Agreement between Lottery and Bingo, Inc., in order to facilitate a proposed business combination of Lottery with Bingo.com, Inc. ("Bingo.com").

We are pleased to notify you that Lottery and Bingo.com have in fact reached an agreement in principle for a combination by means of a reverse triangular merger, as described in a press announcement released by Lottery and Bingo.com December 18, 2000, a copy of which is enclosed.

The goal for closing this transaction is January 31, 2001, with a requirement that the closing must in any event occur by February 28, 2001. This timetable is a practical necessity due to the time needed to comply with various legal requirements and conditions to closing, such as Lottery's need to solicit shareholder approval. For this reason and in consideration of U.S. $10 (enclosed herewith) we respectfully request that Bingo, Inc. agree to amend the November 2, 2000 letter agreement to change all references therein from "December 21, 2000" to "February 28, 2001."

If this amendment of the November 2, 2000 letter is acceptable to Bingo, Inc., please sign a copy of this letter where indicated below and return it to us at your earliest convenience.

Sincerely,

THE LOTTERY CHANNEL, INC.

Roger W. Ach, II, President

ACKNOWLEDGED AND AGREED TO:

BINGO, INC.

By: _____
       Authorized Signatory

Dated: _____

EXHIBIT
D

Bingo, Inc.
Registered in Anguilla No. 4605

By Fax (513) 721-6035
and e-mail (rwa@lottery.com)

February 28, 2001

THE LOTTERY CHANNEL, INC.
2300 Firstar Center
425 Walnut Street
Cincinnati, Ohio, USA
45202

Attention: Roger W. Ach, II – Chairman and CEO

Dear Sirs:

re:  Purchase & Sale of Domain Name "lottery.com"

We hereby agree to amend the agreement between us for the purchase and sale of the "lottery.com" domain name, dated November 3, 1998, as previously amended by letters of amendment dated November 2, 2000 and December 20, 2000, by substituting in that agreement, as currently so amended, the date March 5, 2001 for the date February 28, 2001, everywhere that it appears, again subject to the condition that we will, from and after March 5, 2001, be entitled to take any and all such actions as we would, but for the subsequent amendments thereto, have been entitled to take under the original agreement on November 6, 2000.

Please indicate your concurrence in the foregoing by signing below and returning a copy of this letter to us by fax at the number below.

Yours sincerely,

For and on behalf of                    ACKNOWLEDGED AND AGREED
BINGO, INC.                             this 28th day of February, 2001.

                                        THE LOTTERY CHANNEL, INC.

Donald R. Curtis                        Roger W. Ach, II, Chairman & CEO
Director

cc:  Tammie Williams by email tammie@williams.org
     Bruce Chapman by email chapman@cale.net

Mailing Address: PO Box 727, The Valley, TVI 02F, Anguilla, British West Indies
Registered Office Address: The Hansa Bank Building – 1st Floor, Landsome Road, The Valley, Anguilla, British West Indies
Tel. 264 498 3800  Fax. 264 497 3801

NO.156  P022/002

03/06/81  13:31                          Date: 3/5/01  Time: 4:56:38 PM        Page 2 of 2

From: Tarron Williams To: Roger/Carol

Received: 05.Mar.01 06:53 PM  From: 6046823457  To: 8014571556          Powered by efax.com   Page: 1 of 1
     03/06/01  MON 16:55 FAX 604 882 3457                                        @001

**Bingo, Inc.**
Registered in Anguilla no. 4205

By Fax (513) 721-6835
and e-mail (rwa@lottery.com)

┌──────────────┐
│  EXHIBIT     │
│     E        │
└──────────────┘

March 5, 2001

**THE LOTTERY CHANNEL, INC.**
2100 Fixture Center
425 Walnut Street
Cincinnati, Ohio, USA
45202

Attention: Roger W. Ach, II – Chairman and CEO

Dear Sirs:

re: Purchase & Sale of Domain Name "lottery.com"

As it appears from here that all of the various matters that we thought would be concluded by today may not have been concluded, we hereby agree to amend the agreement between us for the purchase and sale of the "lottery.com" domain name, dated November 3, 1998, as previously amended by letters of amendment dated November 2, 2000, December 20, 2000 and February 28, 2001, by substituting in that agreement, as currently so amended, the date March 12, 2001 for the date March 5, 2001, everywhere that it appears, again subject to the condition that we will, from and after March 12, 2001, be entitled to take any and all such actions as we would, but for the subsequent amendments thereto, have been entitled to take under the original agreement on November 5, 2000.

Please indicate your concurrence in the foregoing by signing below and returning a copy of this letter to us by fax at the number below.

Yours sincerely,

For and on behalf of
BINGO, INC.

*Tm Willi*                                ACKNOWLEDGED AND AGREED
                                          this 5th day of March, 2001.

                                          THE LOTTERY CHANNEL, INC.

Tryon M. Williams                         *Carol A. Manhart*
Director                                  Authorized Signatory

c=  Donald Curtis by email dcurtis@anguillanet.com
    Bruce Chapman by email chapman@cafc.net

Mailing Address: PO Box 727, The Valley, TV1 FL2, Anguilla, British West Indies
Registered Office Address: The Estate Bank Building – 1st Floor, Landsome Road, The Valley, Anguilla, British West Indies
Tel. 264 498 3800  Fax. 264 497 3801

EXHIBIT
F

# Bingo, Inc.
### Registered in Anguilla No. 1615

By Fax (513) 721-6035
and e-mail (roa@lottery.com)

March 12, 2001

**THE LOTTERY CHANNEL, INC.**
2300 Firstar Center
425 Walnut Street
Cincinnati, Ohio, USA
45202

**Attention: Roger W. Ach, II – Chairman and CEO**

Dear Sirs:

re:  **Purchase & Sale of Domain Name "lottery.com"**

As it appears from here that all of the various matters that we thought would be concluded by today may still not have been concluded, we hereby agree to amend the agreement between us for the purchase and sale of the "lottery.com" domain name, dated November 3, 1998, as previously amended by letters of amendment dated November 2, 2000, December 20, 2000, February 23, 2001 and March 5, 2001, by substituting in that agreement as currently so amended, the date March 19, 2001 for the date March 12, 2001, everywhere that it appears, again subject to the condition that we will, from and after March 19, 2001, be entitled to take any and all such actions as we would, but for the subsequent amendments thereto, have been entitled to take under the original agreement on November 6, 2000.

Please indicate your concurrence in the foregoing by signing below and returning a copy of this letter to us by fax at the number below.

Yours sincerely,

For and on behalf of
**BINGO, INC.**

Tryon M. Williams
Director.

ACKNOWLEDGED AND AGREED
this 12th day of March, 2001.

THE LOTTERY CHANNEL, INC.

Authorized Signatory

cc.  **Donald Curtis** by email dcurtis@anguillanet.com
     **Bruce Chapman** by email chapman@cafe.net

Mailing Address: PO Box 727, The Valley, TV1 02P, Anguilla, British West Indies
Registered Office Address: The Hansa Bank Building – 1st Floor, Landsome Road, The Valley, Anguilla, British West Indies
Tel. 264 498 2200   Fax. 264 497 3981

**Bingo, Inc.**
Registered in Anguilla No. 4605

EXHIBIT
tabbies
4

By Fax (513) 721-6035
and e-mail (rwa@lottery.com)

March 16, 2001

**THE LOTTERY CHANNEL, INC.**
2300 Firstar Center
425 Walnut Street
Cincinnati, Ohio, USA
45202

Attention:  Roger W. Ach, II – Chairman and CEO

Dear Sirs;

re:  Purchase & Sale of Domain Name "lottery.com"

We now understand, but have not been formally so advised, that merger discussions between yourselves and Bingo.com, Inc. have ceased. As you know, the possibility of a merger with Bingo.com, Inc. has been the motivating force behind our agreeing to postpone the making of the election required of us under Section 4.1 of the original agreement of purchase and sale between us dated November 3, 1998. By letters of amendment dated November 2, 2000, December 20, 2000, February 28, 2001, March 5, 2001 and March 12, 2001, which we each executed and delivered, we agreed, ultimately and inter alia, to substitute the date March 19, 2001 for the November 6, 2000 date specified in the original agreement for the making of that election (the original agreement, as so amended, being hereinafter referred to as the "Amended Agreement").

Under the Amended Agreement, we will be entitled and required, on or after March 19, 2001, to elect between the alternatives specified in Section 4.1 thereof. We are prepared to discuss those alternatives and any other alternatives that may warrant consideration. To permit each of us time to discuss possible alternatives and to formally document any alternative(s) that may be found to be mutually satisfactory, we are prepared to and do hereby agree to further amend the Amended Agreement by substituting therein the date March 28, 2001 for the date March 19, 2001, everywhere that it appears, again subject to the condition that we will, from and after March 28, 2001, be entitled to take any and all such actions as we would, but for the subsequent amendments thereto, have been entitled to take under the original agreement on November 6, 2000, provided that we have received from you, by 3:00 p.m. Pacific Time, your concurrence in such an extension arrangement and your agreement that the Amended Agreement be so amended. If you wish to so proceed, please indicate your concurrence and agreement by signing in these spaces provided below and returning a copy of this letter to us by fax at the number specified below.

Bingo, Inc.
Registered in Anguilla No. 4603

If we have not received your concurrence in the foregoing extension arrangement and agreement to amend the Amended Agreement accordingly by 3:00 p.m. Pacific Time today, we will proceed with those actions as we were entitled and required to take under the original agreement on November 6, 2000.

Please give this matter your immediate attention.

Yours sincerely,

For and on behalf of
BINGO, INC.

Tryon M. Williams
Director

AMENDMENT AS SPECIFIED AGREED TO
this 16th day of March, 2001.

THE LOTTERY CHANNEL, INC.

Authorized Signatory

cc.  Donald Curtis by email dcurtis@anguillanet.com
     Bruce Chapman by email chapman@cafe.net

2 of 2

EXHIBIT

_H_

## Bingo, Inc.
Registered in Anguilla No. 4605

By Fax (513) 721-6035
and e-mail (rwa@lottery.com)

March 27, 2001

**THE LOTTERY CHANNEL, INC.**
2300 Firstar Center
425 Walnut Street
Cincinnati, Ohio, USA
45202

Attention:  Roger W. Ach, II – Chairman and CEO

Dear Sirs:

re:  Purchase & Sale of Domain Name "lottery.com"

We had hoped that there would have been a determination by now as to what arrangements, if any, can be worked out with respect to our agreement for the purchase and sale of the "lottery.com" domain name. Although we have not received a proposal from you, it appears that our providing you with a little more time to structure something may be useful. Accordingly, we hereby agree to amend the agreement between us for the purchase and sale of the "lottery.com" domain name, dated November 3, 1998, as previously amended by letters of amendment dated November 2, 2000, December 20, 2000, February 28, 2001, March 5, 2001, March 12, 2001 and March 16, 2001, by substituting in that agreement, as currently so amended, the date April 4, 2001 for the date March 28, 2001, everywhere that it appears, again subject to the condition that, we will, from and after April 4, 2001, be entitled to take any and all such actions as we would, but for the subsequent amendments thereto, have been entitled to take under the original agreement on November 6, 2000.

Please indicate your concurrence in the foregoing by signing below and returning a copy of this letter to us by fax at the number below.

Yours sincerely,

For and on behalf of                      ACKNOWLEDGED AND AGREED
BINGO, INC.  ﹀                            this 28th day of March, 2001.

_Tn Will_                                 THE LOTTERY CHANNEL, INC.

                                          _Carol A. Menhardt_

Tryon M. Williams                         Authorized Signatory
Director

cc:  Donald Curtis by email dcurtis@anguillanet.com
     Bruce Chapman by email chapman@cafe.net

# Bingo, Inc.

Registered in Anguilla No. 4605

By Fax to Park Lane Hotel, NYC
and e-mail (rwa@lottery.com)

April 3, 2001

**THE LOTTERY CHANNEL, INC.**
2300 Firstar Center
425 Walnut Street
Cincinnati, Ohio, USA
45202

**Attention: Roger W. Ach, II – Chairman and CEO**

Dear Sirs:

re:  **Purchase & Sale of Domain Name "lottery.com"**

As we appear to be close to settling the revised terms and conditions to which our agreement for the purchase and sale of the "lottery.com" domain name will hereafter be subject, and to provide us with adequate time to document whatever revisions we do agree upon, we, Bingo, Inc., hereby agree to amend the agreement between us for the purchase and sale of the "lottery.com" domain name, dated November 3, 1998, as previously amended by letters of amendment dated November 2, 2000, December 20, 2000, February 28, 2001, March 5, 2001, March 12, 2001, March 16, 2001 and March 27, 2001, by substituting in that agreement, as currently so amended, the date April 13, 2001 for the date April 4, 2001, everywhere that it appears, again subject to the condition that we will, from and after April 13, 2001, be entitled to take any and all such actions as we would, but for the subsequent amendments thereto, have been entitled to take under the original agreement on November 6, 2000.

Please indicate your concurrence in the foregoing by signing below and returning a copy of this letter to us by fax at the number below.

Yours sincerely,

For and on behalf of
BINGO, INC.

*(signature)*

Tryon M. Williams
Director

ACKNOWLEDGED AND AGREED
this 3rd day of April, 2001.

THE LOTTERY CHANNEL, INC.

*(signature)*

Authorized Signatory

cc.  Donald Curtis by email dcurtis@anguillanet.com
     Bruce Chapman by email chapman@mfa.net

Mailing Address: PO Box 727, The Valley, TV1 02P, Anguilla, British West Indies
Registered Office Address: The Hansa Bank Building – 1st Floor, Landscape Road, The Valley, Anguilla, British West Indies
Tel. 264 498 2800  Fax. 264 497 5281



EXHIBIT

J

Bingo, Inc.

Registered in Anguilla No. 4605

By Fax (513) 721-6035
and e-mail (rwa@lottery.com)

April 13, 2001

THE LOTTERY CHANNEL INC.
2300 Firstar Center
425 Walnut Street
Cincinnati, Ohio, USA
45202

Attention: Roger W. Ach, II – Chairman and CEO

Dear Sirs:

re: Purchase & Sale of Domain Name "lottery.com"

We have delivered to you a form of agreement setting out proposed amendments to our existing agreement for the purchase and sale of the "lottery.com" domain name. Unfortunately, delivery thereof has coincided with this year's somewhat extended holiday season. To provide adequate time for consideration of the form of amending agreement, we hereby agree to amend the agreement between us for the purchase and sale of the "lottery.com" domain name, dated November 3, 1998, as previously amended by letters of amendment dated November 2, 2000, December 20, 2000, February 28, 2001, March 5, 2001, March 12, 2001, March 16, 2001 and April 5, 2001, by substituting in that agreement, as currently so amended, the date April 18, 2001 for the date April 13, 2001, everywhere that it appears, again subject to the condition that we will, from and after April 18, 2001, be entitled to take any and all such actions as we would, but for the subsequent amendments thereto, have been entitled to take under the original agreement on November 6, 2000.

Please indicate your concurrence in the foregoing by signing below and returning a copy of this letter to us by fax at the number below.

Yours sincerely,

For and on behalf of
BINGO, INC.

*[signature]*

Tryon M. Williams
Director

ACKNOWLEDGED AND AGREED
this 13th day of April, 2001.

THE LOTTERY CHANNEL INC.

*[signature]*

Authorized Signatory

cc. Donald Curtis by email dcurtis@anguillanet.com
Bruce Chapman by email chapman@cati.net

04/18/01   17:22                              44-20-7588-0513                          NO.793   P001/001

From Tarrie Williams 020-7588-0513 To: Roger Ach/Carol Meinhart          Date 18/04/01 Time: 22:17:36          Page 1 of 1



**EXHIBIT**

K

# Bingo, Inc.

Registered in Anguilla No. 4605

By Fax (513) 721-6035
and e-mail (rwa@lottery.com)

April 18, 2001

THE LOTTERY CHANNEL INC.
2300 Firstar Center
425 Walnut Street
Cincinnati, Ohio, USA
45202

Attention: Roger W. Ach, II – Chairman and CEO

Dear Sirs:

re:   Purchase & Sale of Domain Name "lottery.com"

We have delivered to you a form of agreement setting out proposed amendments to our existing
agreement for the purchase and sale of the "lottery.com" domain name. To provide adequate time for
consideration of the form of amending agreement, we hereby agree to amend the agreement between us
for the purchase and sale of the "lottery.com" domain name, dated November 3, 1998, as previously
amended by letters of amendment dated November 2, 2000, December 20, 2000, February 28, 2001,
March 5, 2001, March 12, 2001, March 16, 2001, April 3, 2001, and April 13, 2001 by substituting in that
agreement, as currently so amended, the date April 20, 2001 for the date April 18, 2001, everywhere that
it appears, again subject to the condition that we will, from and after April 20, 2001, be entitled to take
any and all such actions as we would, but for the subsequent amendments thereto, have been entitled to
take under the original agreement on November 6, 2000.

Please indicate your concurrence in the foregoing by signing below and returning a copy of this letter to
us by fax at the number below.

Yours sincerely,

For and on behalf of                         ACKNOWLEDGED AND AGREED
BINGO, INC.                                  this 18th day of April, 2001.

                                             THE LOTTERY CHANNEL, INC.

Tryon M. Williams                            Authorized Signatory
Director

cc.  Donald Curtis by email dcurtis@anguillanet.com
     Bruce Chapman by email chapman@cru5.net

Mailing Address: PO Box 727, The Valley, TVI 0ZP, Anguilla, British West Indies
Registered Office Address: The House Bank Building – 1st Floor, Landsome Road, The Valley, Anguilla, British West Indies
Tel. 264 498 3990   Fax. 264 497 5001

# Bingo, Inc.
Registered in Anguilla No. 4625

**EXHIBIT**

tabbies

$\underline{\textit{L}}$

April 18, 2001


**THE LOTTERY CHANNEL, INC.**
2300 Firstar Center
425 Walnut Street
Cincinnati, Ohio, USA
45202

Attention: Roger W. Ach, II
_____ Chairman and CEO


Dear Sirs:

re:  Amendment of Agreement of Purchase and Sale
     with respect to Domain Name "lottery.com"

Bingo, Inc. and The Lottery Channel, Inc. (together with Strauss & Troy, as escrow agent) entered into an agreement dated November 3, 1998 under which Bingo, Inc. agreed to sell to The Lottery Channel, Inc. and The Lottery Channel, Inc. agreed to purchase from Bingo, Inc. the domain name "lottery.com", which agreement was subsequently amended by letters of amendment dated November 2, 2000, December 20, 2000, February 28, 2001, March 5, 2001, March 12, 2001, March 16, 2001, March 27, 2001, April 3, 2001 and April 13, 2001 (such agreement, as so amended, hereinafter referred to as the "Purchase Agreement"), and has not otherwise been amended.

In consideration of the mutual benefits to be derived and the conditions and promises contained herein and, in particular, of Bingo, Inc. agreeing not to avail itself of those rights currently available to it under Section 4.1 of the Purchase Agreement and the benefit derived by The Lottery Channel, Inc. therefrom, and intending to be legally bound hereby, Bingo, Inc. and The Lottery Channel, Inc. hereby agree as follows:

1.  The Purchase Agreement is amended as to the amount of the Purchase Price by deleting from Section 3.1 thereof the amount "Two Hundred Thousand United States Dollars (U.S.$200,000.00), subject to adjustment as provided in Section 4 hereof" and substituting therefor the amount "Five Hundred and Fifty-One Thousand Five Hundred and Ninety-One United States Dollars and Eighty-One Cents (U.S.$551,591.81)".

2.  Bingo, Inc. acknowledges having received from The Lottery Channel, Inc. under the Purchase Agreement 8,333 common shares without par value in the capital stock of The Lottery Channel, Inc. (the "Shares") on account of the Purchase Price.  The Purchase

Bingo, Inc.
Registered in Anguilla No. 4605

Agreement is amended as to the amount of the Purchase Price satisfied by issuance of the Shares by deleting from Section 3.2 thereof the amount "One Hundred and Twenty-Five Thousand United States Dollars (U.S.$125,000.00)" and substituting therefor the amount "Ten Thousand Four Hundred and Sixteen United States Dollars and Twenty-Five Cents (U.S.$10,416.25)".

3.    The Purchase Agreement is amended by deleting therefrom Section 3.3 in its entirety and substituting therefor.

"   3.3   Warrant Consideration.   In satisfaction of Ten United States Dollars (U.S.$10.00) of the Purchase Price, the Purchaser shall on May 1, 2001 issue to Bingo, Inc. a warrant (the "Bingo Warrant") entitling Bingo, Inc. to purchase, at any time prior to April 30, 2011, at and for a price of One United States Dollar and Twenty-Five Cents (U.S.$1.25) per share, up to 850,000 fully-paid – and nonassessable shares of common stock of the Company, provided that the number and type of securities, assets or property in respect of which the Bingo Warrant is exercisable and the purchase price required to be paid therefor shall each be subject to adjustment in those circumstances specified in the form of Bingo Warrant. The Bingo Warrant shall be in the form attached hereto as Schedule "A" and shall be subject to those further terms and conditions therein specified, which terms and conditions are, by this reference, incorporated herein. "

The referenced Schedule "A" to the Purchase Agreement shall be in the form attached hereto.

4.    Bingo, Inc. acknowledges having received from The Lottery Channel, Inc. under the Purchase Agreement Sixty-One Thousand One Hundred and Sixty-Five United States Dollars and Fifty-Six Cents (U.S.$61,165.56) on account of the Purchase Price. The Lottery Channel, Inc. shall not be obligated to pay any amounts which may have become payable pursuant to Section 3.4 of the Purchase Agreement in respect of the period commencing on October 1, 2000 and ending on the date hereof. The Purchase Agreement is amended to reference the aggregate amount paid thereunder to date by The Lottery Channel, Inc. and to provide for payment of the Four Hundred and Eighty Thousand United States Dollar (U.S.$480,000.00) balance of the Purchase Price by deleting therefrom Section 3.4 in its entirety and substituting therefor:

"   3.4   Monetary Consideration.   In further satisfaction of the Purchase Price the Purchaser shall pay to Bingo, Inc. the sum of:

   (a)   Sixty-One Thousand One Hundred and Sixty-Five United States Dollars and Fifty-Six Cents (U.S.$61,165.56) on or before April 18, 2001;

   (b)   Ten Thousand United States Dollars (U.S.$10,000.00) on April 23, 2001 and on May 1, 2001 and on the first United States business day of each month thereafter, to and including March, 2002;

Bingo, Inc.
Registered in Anguilla No. 4625

(c)  Thirteen Thousand United States Dollars (U.S.$13,000.00) on April 1, 2002
     and on the first United States business day of each month thereafter, to and
     including March, 2003; and

(d)  Seventeen Thousand United States Dollars (U.S.$17,000.00) on April 1,
     2003 and on the first United States business day of each month thereafter, to
     and including March, 2004;

by wire-transferring the amount thereof to the account of Bingo, Inc., in accordance
with the following instructions:

To:  Barclays Bank PLC
     75 Wall Street
     New York
     NY, USA

ABA Number:        026002574

For Credit To:     Barclays Bank PLC
                   Anguilla
                   British West Indies

Account Number:    28019840265

For Further Credit to the account of:  Bingo, Inc.
                                       Account Number:  134 – 7256
                                       Advising:        Donald Curtis
                                                        Tel. (264) 498-3800

provided that if any payment is not made on or before the date on which it is
required to be made and Bingo, Inc. has given written notice thereof to the Purchaser
(a "Default Notice") and the Purchaser has not, on or before the fifteenth (15th)
United States business day after the date on which the Purchaser receives or is
deemed to have received the applicable Default Notice, made the payment specified
therein, and:

(e)  if the payment specified in the applicable Default Notice is a Ten Thousand
     United States Dollar (U.S.$10,000.00) payment:

     (i)  the sum required to be paid on the first United States business day of
          each of the next twelve months shall be Thirteen Thousand United States
          Dollars (U.S.$13,000.00), following which the sum required to be paid
          on the first United States business day of each of the next twelve months
          shall be Seventeen Thousand United States Dollars (U.S.$17,000.00);
          and

     (ii) the Determination Date referred to in Section 4.1 hereof shall be that
          date which is Twenty-Four (24) months after the date on which the
          specified payment was required to have been made;

Bingo, Inc.
Registered in Anguilla No. 4605

  (f) if the payment specified in the applicable Default Notice is a Thirteen
    Thousand United States Dollar (U.S.$13,000.00) payment:

    (i) the sum required to be paid on the first United States business day of
      each of the next twelve months shall be Seventeen Thousand United
      States Dollars (U.S.$17,000.00); and

    (ii) the Determination Date referred to in Section 4.1 hereof shall be that
      date which is Twelve (12) months after the date on which the specified
      payment was required to have been made; and

  (g) if the payment specified in the applicable Default Notice is a Seventeen
    Thousand United States Dollar (U.S.$17,000.00) payment, the Determination
    Date referred to in Section 4.1 hereof shall be that date which is One (1)
    month after the date on which the applicable payment was required to have
    been made;

  and the amount of the payment specified in the applicable Default Notice, and the
  amounts of all payments of like amount which were originally scheduled to have
  been made thereafter, shall remain payable and may be paid at any time on or before
  the Determination Date referred to in Section 4.1 hereof."

5. The Purchase Agreement is amended as to Bingo, Inc.'s rights to reacquire the domain name
  "lottery.com" and associated intellectual property by deleting therefrom Sections 4.1 and 4.2
  in their entirety and substituting therefor:

  " 4.1  **Rights.**  In this agreement, the "Determination Date" shall mean the earliest of
  April 1, 2004 and any revised date determined in respect thereof pursuant to Section
  3.4 hereof. In this agreement, a "Going Public Transaction" shall mean an initial
  public offering, reverse take-over, merger, acquisition for cash or securities or any
  other transaction which results in the common shares of the Purchaser, or any
  securities for which the common shares of the Purchaser may be exchanged or sold,
  being listed for trading on a public market. In this agreement, the "Minimum Price
  per Share" shall mean, in respect of the common shares of the Purchaser, Two
  United States Dollars and Fifty Cents (U.S.$2.50) per share, or, if the common
  shares of the Purchaser shall have been exchanged for other securities, shall mean, in
  respect of such other securities, Two United States Dollars and Fifty Cents
  (U.S.$2.50) per that number of such securities for which one common share of the
  Purchaser shall have been exchanged (on the basis, in each case, of the common
  shares of the Purchaser being constituted at the time of such transaction as they are
  presently constituted; the specified minimum price in each case to be proportionately
  adjusted in the manner specified in Section 5 of the Bingo Warrant should any of the
  capital alteration events therein specified have occurred). If, on the Determination
  Date:

    (a) the Purchaser has not paid to Bingo, Inc. pursuant to Section 3.4 hereof,
      in aggregate, Five Hundred and Forty-One Thousand One Hundred and
      Sixty-Five United States Dollars and Fifty-Six Cents (U.S.$541,165.56)

04.20.01  14:27                    1  264 497 3801              (1)  264-497-3801 .      P. 6

Apr  17  01  03:40p

Bingo, Inc.
Registered in Anguilla No.  4605

or the Purchaser is otherwise in default under any of the provisions of this agreement or the Bingo Warrant; or

(b)    the Purchaser has not completed a Going Public Transaction:

(i)    at, if such transaction is an initial public offering of shares of the Purchaser or other applicable securities or is an acquisition of shares of the Purchaser or other applicable securities for cash, a price per share (or per the applicable number of other securities) not less than the Minimum Price per Share; or

(ii)    for the twenty trading days after which, if such transaction is any other Going Public Transaction, the average closing price per share (or per the applicable number of other securities) reported on the public market on which they trade is not less than the Minimum Price per Share;

then the Purchaser shall transfer, assign and relinquish unto Bingo, Inc. the Domain Name and all of the right, title and interest of the Purchaser therein and thereto and in and to the registration thereof, including any and all trademark and/or servicemark rights which may by then have arisen in favor of the Purchaser at common law or by statute as result of its use of the Domain Name, and, in that regard, shall, complete, execute before a notary public and deliver to Bingo, Inc., forthwith after the Determination Date, a registrant name change agreement in the form then specified by the administrator of the InterNIC internet domain name registration service and shall deliver to Bingo, Inc. all such other documents and/or instruments as may be required to give full effect to this provision. "

6.    The Purchase Agreement is amended by adding the following to Section 10.1 thereof:

"Any Default Notice to be given to the Purchaser pursuant to Section 3.4 hereof shall also be sufficiently given if sent to the Purchaser by facsimile transmission to (513) 721-6035, or to such other number as the Purchaser shall, at the time such notice is to be sent, have most lately notified Bingo, Inc., in the manner provided in this Section 10.1, to be its number for receipt of facsimile transmissions, and any Default Notice so given shall be deemed to have been given and received on the day on which it was sent. "

7.    All of the obligations of Strauss & Troy under the Purchase Agreement having been satisfied and no further benefit to accrue to them thereunder, the Purchase Agreement be amended by removing Strauss & Troy as a party thereto, deleting Section 9 thereof in its entirety, and deleting all references therein to Section 9 thereof.

Binga, Inc.
Registered in Anguilla No. 4405

8. Unless expressly amended hereby, all remaining terms and provisions of the Purchase Agreement shall remain unchanged and in full force and effect.

Please indicate your agreement with the foregoing provisions by signing where indicated below and returning a signed copy hereof to us by facsimile at (264) 497-3801. Please return a fully executed original to us at our address set out in the Purchase Agreement (and on the first page hereof).

BINGO, INC.
an Anguilla corporation

By: _____
Name: DONALD R. CURTIS
Title: DIRECTOR

THE LOTTERY CHANNEL, INC.
a Delaware corporation

By: _____
Name: R. CASEY BARACH
Title: SVP & GENERAL COUNSEL
Date: 4-20-01

6 of 6

# SCHEDULE "A"

## WARRANT

THE SECURITIES REPRESENTED BY THIS CERTIFICATE (THE "SECURITIES")
HAVE BEEN ISSUED IN RELIANCE UPON EXEMPTIONS FROM REGISTRATION
UNDER THE SECURITIES ACT OF 1933 (THE "1933 ACT"), AND APPROPRIATE
EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES LAWS OF
OTHER APPLICABLE JURISDICTIONS.   THE SECURITIES MAY NOT BE
OFFERED FOR SALE, SOLD OR TRANSFERRED OTHER THAN PURSUANT TO AN
EFFECTIVE REGISTRATION UNDER THE 1933 ACT OR AN EXEMPTION FROM
REGISTRATION UNDER THE 1933 ACT AND THE APPLICABLE SECURITIES
LAWS OF ANY OTHER JURISDICTION.  THE ISSUER SHALL BE ENTITLED TO
REQUIRE AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT
WITH RESPECT TO COMPLIANCE WITH THE 1933 ACT AND APPLICABLE
SECURITIES LAWS OF ANY OTHER JURISDICTION.

Right to Purchase
Common Stock

of

## THE LOTTERY CHANNEL, INC.

The Lottery Channel, Inc., a Delaware corporation (the "Company"), hereby certifies
that, for value received, Bingo, Inc. (the "Holder"), or its successors or assigns, is entitled,
subject to the terms set forth below, to purchase from the Company at any time or from time to
time until 5:00 p.m. Eastern Time on April 30, 2011 (the "Expiration Date") 850,000 fully-paid
and nonassessable shares of common stock of the Company ("Common Stock"), at a price per
share of $1.25, provided that the number and type of securities, assets or property which the
Holder is entitled to purchase and receive upon exercise of the rights represented by this Warrant
and the purchase price required to be paid in respect thereof shall each be subject to adjustment
as provided in Sections 2, 5 and 6 hereof.

1.    Definitions.

As used herein the following terms, unless the context otherwise requires, shall have the
respective meanings set forth below:

(a)    the "Shares" shall mean all those shares of Common Stock of the Company which
at any time and from time to time are or have been purchasable and receivable upon the exercise

of rights represented by this Warrant, subject to such adjustments as may from time to time be made pursuant to Sections 2, 5 and/or 6 hereof;

(b)    the "Purchase Price" shall mean $1.25 per Share, subject to such adjustments as may from time to time be made thereto pursuant to Sections 5 and/or 6 hereof;

(c)    "Insiders" shall mean all those persons who are or who at any time have been directors, officers and/or employees of the Company or with whom the Company does not deal or has at any time not dealt at arms' length in connection with the issuance of securities of the Company, and all of the associates and affiliates (within the meanings attributed thereto under the Securities Act of 1933 and the regulations thereunder) of such persons;

(d)    the "Insiders' Shares" shall mean, at any specified time, all those shares of Common Stock of the Company which at any time between the time this Warrant is issued and that specified time have been held by Insiders, all those shares of Common Stock of the Company into which other securities of the Company held by Insiders at that specified time may then be converted and all those shares of Common Stock of the Company in respect of which options or share purchase rights held by Insiders at that specified time may then be exercised;

(e)    the "Holder's Shares" shall mean, at any specified time, all those Shares which have then been purchased and received upon the exercise of rights represented by this Warrant and all those Shares which, prior to any adjustment which may then be applicable, then remain purchasable and receivable upon the exercise of rights represented by this Warrant;

(f)    the "Share Ratio" shall mean, at any specified time, the ratio of the number of Holder's Shares to the number of Insiders' Shares;

(g)    the "Initial Share Ratio" shall mean the Share Ratio at the time this Warrant is issued; and

(h)    a "Going Public Transaction" shall mean an initial public offering, reverse take-over, merger, acquisition or any other transaction which results in the Common Stock of the Company, or any securities for which the Common Stock of the Company may be exchanged or sold, being listed for trading on a public market.

2.    Adjustment of Number of Shares on Insider Transactions.

If, as a result of any transaction or series of transactions, the Share Ratio would, without the adjustment here provided for, become less than the Initial Share Ratio, the number of Shares in respect of which this Warrant may be exercised shall be increased by that whole number of shares of Common Stock of the Company which, as nearly as possible, makes the Share Ratio equal to the Initial Share Ratio.

3.    Exercise and Term of Warrant.

(a)    The purchase rights represented by this Warrant may be exercised by the Holder in whole or in part by the surrender of this Warrant to the Company at its principal office, along

2

04/20/01  14:23                    1  264 497 3801                                 NO.337  P010

Apr 17 01 03:41p                                          (1)  264-497-3801        p.10

with a written notice stating that the Holder intends to purchase all or a specified number of the Shares pursuant to this Warrant and specifying the name or names in which the Holder wishes the certificate or certificates for such shares to be issued, and together with payment of the Purchase Price for the Shares then purchased. Such payment will be made, at the option of the Holder, by certified or official bank check payable to the order of the Company in same day funds or by wire transfer of same day funds to an account designated by the Company for such purpose. If the number of Shares then purchased is less than the total number of Shares then issuable upon exercise of this Warrant, the Company will cancel this Warrant upon surrender and will execute and deliver a new Warrant of like tenor and date for the balance of the Shares issuable upon the exercise of this Warrant (provided, that if only a fractional share remains unexercised, the Company will make a cash payment therefor in lieu of issuing a new Warrant). As promptly as practicable after such surrender of this Warrant, the Company will issue and deliver to the Holder, at the address appearing in the books of the Company or otherwise designated by Holder, a certificate or certificates for the applicable number of Shares. Certificates representing Shares purchased pursuant to this Warrant will bear restrictive legends substantially similar to those at the beginning of this Warrant, if required by applicable state and federal securities law.

(b)     In lieu of exercising this Warrant as specified above, the Holder may at any time and from time to time after the closing of a Going Public Transaction, by written notice stating that the Holder so elects, convert this Warrant, in whole or in part, into a number of fully paid and non-assessable common shares of the Company determined by multiplying the number of Shares in respect of which the Holder is electing to convert this Warrant by a fraction the numerator of which is the difference between the closing price of the common shares of the Company on the market on which they trade reported for the trading day immediately prior to the day on which the applicable notice is received by the Company (the "Conversion Price") and the Purchase Price and the denominator of which is the Conversion Price.

(c)     This Warrant will expire and be of no further force and effect upon the earlier to occur of (A) the time when it has been exercised or converted with respect to all Shares which the Holder is or may become entitled to purchase hereunder, or (B) 5:00 p.m., Eastern Time, on the Expiration Date.

4     Reservation of Shares; Validity of Issuance. The Company covenants and agrees that it will reserve for issuance and keep available out of its authorized but unissued Common Stock, free from preemptive rights, such number of Shares in respect of which this Warrant is from time to time exercisable. The Company represents and warrants that all Shares issued upon exercise(s) of this Warrant will, upon issuance, be fully-paid and nonassessable and free from all taxes, liens, charges or other type of encumbrance in respect of their issuance.

5.     Adjustments for Merger, Consolidation or Sale of Assets. In the event of any reorganization, reclassification or any consolidation or merger of the Company with or into another person or the sale of all or substantially all of its assets to another corporation (each, a "Reorganization"), the Holder will have the right to purchase and receive, upon the basis and upon the terms and conditions specified in this Warrant and in lieu of the Shares then purchasable and receivable upon the exercise of the rights represented by this Warrant, the kind and number of shares of stock, securities, assets or other property (including cash) of the Company, or other corporation resulting from such consolidation or surviving such merger, to

3

which a holder of the number of outstanding shares of Common Stock equal to the number of shares of Common Stock then purchasable and receivable upon the exercise of the rights represented by this Warrant immediately prior to such Reorganization would have been entitled to receive with respect to such Reorganization, and in any such case appropriate provision will be made in the application of the provisions herein set forth with respect to the rights and interests thereafter of the Holder to the end that the provisions herein set forth will thereafter be applicable, as nearly as reasonably may be, in relation to any shares, other securities, assets or property thereafter deliverable upon the exercise of this Warrant. In the event of a consolidation or merger of the Company as a result of which a greater or lesser number of shares of common stock of the surviving corporation are issuable to holders of Common Stock of the Company outstanding immediately prior to such consolidation or merger, the Purchase Price in effect immediately prior to such consolidation or merger will be adjusted in the same manner as though there were a split or combination of the outstanding shares of Common Stock of the Company. The Company will not effect any Reorganization unless prior to or simultaneously with the consummation of such Reorganization the successor corporation (if other than the Company) resulting from such Reorganization will assume by written instrument executed and delivered to the Holder at the address of the Holder appearing on the books of the Company, or to such other place as may be designated by the Holder in writing to the Company, the obligation to deliver to the Holder such shares, securities, assets or property as, in accordance with the provisions of this Section 5, the Holder may be entitled to purchase. The provisions of this Section 5 will similarly apply to successive Reorganizations.

6.      Adjustments for Stock Splits and Combinations.  If the Common Stock is subdivided into a greater number or a dividend in Common Stock or other securities of the Company convertible or exchangeable into Common Stock (in which latter event the number of shares of Common Stock issuable upon the conversion or exchange of such securities will be deemed to have been distributed), will be paid in respect to the Common Stock, the number of Shares which may be acquired by the Holder upon the exercise of this Warrant and the Purchase Price will, simultaneously with the effectiveness of such subdivision, additional issue or immediately after the record date of such dividend, be proportionately adjusted (that is, the number of shares purchasable upon exercise of the Warrant will be proportionately increased, and the Purchase Price per share will be proportionately decreased), and conversely, if the outstanding common stock will be combined into a smaller number of shares, the number of Shares of Common Stock which may be acquired by the Holder upon the exercise of this Warrant and the Purchase Price will, simultaneously with the effectiveness of such combination, be proportionately adjusted (that is, the number of shares subject to the Warrant will be proportionately decreased, and the Purchase Price per share will be proportionately increased).

7.      Registration Rights.  "Registered Shares" shall mean any and all of those shares of Common Stock of the Company acquired by the Holder upon exercise(s) of the rights represented by this Warrant.

(a)      In connection with or forthwith after the closing of a Going Public Transaction by the Company, the Company shall, at its sole expense (except for underwriting discounts and commissions), take all reasonable actions (including preparing and filing with the Securities and Exchange Commission (the "SEC") a registration statement (the "Registration Statement") on an annual basis and the prospectus forming a part thereof) as may be necessary to have such registration statement declared effective by the SEC at the earliest date practicable and to keep

such registration statement effective, and to comply with the provisions of the Securities Act of 1933 (the "Securities Act") and all applicable rules and regulations promulgated thereunder in order to permit the Holder during such period to resell or otherwise dispose of all of its Registered Shares, without further registration thereof under the Securities Act; provided that, before filing any such documents, the Company shall furnish the Holder with copies thereof in the form in which they are proposed to be filed and will consider in good faith any written comments or suggested changes thereto made by counsel designated by the Holder. Without limiting the generality of the foregoing, the Company shall amend or supplement the Registration Statement to increase the number of shares subject to resale by the Holder thereunder in the event that the number of Registered Shares exceeds the number disclosed thereunder as being available for resale by the Holder.

(b)    Following any resale by the Holder of Registered Shares pursuant to the Registration Statement, the Holder shall notify the Company of the number of Registered Shares sold and the date thereof. Nothing herein shall be deemed to require the Holder to notify the Company of any sale of Registered Shares pursuant to Rule 144 and regulations promulgated under the Securities Act, an exemption from the registration requirements of the Securities Act or any other means (other than pursuant to the Registration Statement).

(c)    The Company agrees to take all other reasonable steps to ensure that the Holder's resale of Registered Shares under the Registration Statement is effected in accordance with the Securities Act and the regulations promulgated thereunder, including:

(i)    promptly filing all such reports as may be necessary under the Securities Exchange Act of 1934 (an "Exchange Act Report") to update the information relating to the Company included in the Registration Statement;

(ii)   promptly furnishing to the Holder such number of copies of such Registration Statement, each amendment and supplement thereto, the prospectus included therein and such other documents as the Holder may reasonably request in order to facilitate the disposition of Registered Shares;

(iii)  using its reasonable efforts to register or qualify the resales under state securities or "blue sky" laws and taking any and all other acts that may be necessary or advisable to enable the Holder to consummate such resales in such jurisdictions, provided however, that the Company shall not be required to qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this subparagraph or subject itself to taxation in any such jurisdiction;

(iv)   notifying the Holder, at any time when a prospectus relating thereto is required to be delivered by the Holder under the Securities Act in connection with a resale of Registered Shares, of the occurrence of any event as a result of which the prospectus included in the Registration Statement contains an untrue statement of a material fact or omits any fact necessary to make the statements therein not misleading, and, at the request of the Holder, preparing a supplement or amendment to such prospectus or file an Exchange Act Report so that, as thereafter delivered to the purchasers of such stock, such prospectus will not

5

contain an untrue statement of a material fact or omit to state any fact necessary to make the statements therein not misleading;

(v) otherwise using its reasonable commercial efforts to comply with all applicable rules and regulations of the SEC; and

(vi) in the event of the issuance of any stop order suspending the effectiveness of the Registration Statement, or of any order suspending or preventing the use of any related prospectus or suspending the qualification of any Common Stock of the Company registered under such Registration Statement for sale in any jurisdiction, using its reasonable commercial efforts promptly to obtain the withdrawal of such order.

8.    Notice of Certain Events. If, at any time:

(a)    the Company declares or pays any dividend or makes any distribution to the holders of its Common Stock;

(b)    the Company offers for subscription any of its Common Stock or any additional shares of stock of any class or other rights;

(c)    the Company grants any options or subscription rights in respect of any of its Common Stock or issues any securities of the Company that are convertible into Common Stock of the Company or enters into any non-arms' length transaction with any person(s) with respect to any securities of the Company;

(d)    there is a Reorganization of the Company;

(e)    there is a voluntary or involuntary dissolution, liquidation or winding up of the Company; or

(f)    there is an adjustment to the Purchase Price pursuant to Section 5;

then, in any one or more of the above cases, the Company will give written notice, by first-class mail, postage prepaid, telecopier, or overnight delivery, addressed to the Holder at the address of the Holder as shown on the books of the Company on the date on which (i) the books of the Company will close or a record will be taken for such dividend, distribution or subscription rights or (ii) such Reorganization, sale, dissolution, liquidation or winding up will take place, as the case may be. Such notice will also specify the date as of which the holders of common stock of record will participate in said dividend, distribution or subscription rights, or will be entitled to exchange their common stock for securities or other property deliverable upon such Reorganization, sale, dissolution, liquidation or winding up, as the case may be. If pursuant to subsection (vi) above, such notice will state the Purchase Price resulting from such adjustment, setting forth in reasonable detail the method of calculation and the facts upon which such calculation is based. Such written notice will be given not less than 30 days prior to the record date or the date on which the transfer books of the Company are closed in respect to such record date or prior to the action in question. Any notices given pursuant to this Section 8 will be effective and deemed received upon the date of actual receipt or upon the fifth calendar day

subsequent to deposit in the United States mail (or other comparable mail system), whichever is earlier.

9.    No Impairment.  The Company will not, by amendment of its charter or bylaw documents or through any Reorganization, transfer of assets, dissolution, issue or sale of securities or any other voluntary action, invalidate or seek to avoid the observance or performance of any of the terms to be observed or performed by the Company under this Warrant, but will at all times in good faith assist in the carrying out of all the provisions of Sections 2 through 8 and in the taking of all such action as may be necessary or appropriate in order to protect the rights of the Holder.

10.    No Voting Rights.  This Warrant will not entitle the Holder to any voting rights or other rights as a shareholder of the Company, and no dividend or interest will be payable or accrue in respect of this Warrant or the interest represented by or the shares purchasable under this Warrant until and unless, and except to the extent that, this Warrant is exercised.

11.    Stock Certificates.  The Company will issue stock certificates upon the exercise of this Warrant without charge to the Holder for any tax (other than taxes attributable to any difference between the fair market value and the exercise price of this Warrant on the date of the exercise of this Warrant or transfer taxes resulting from issuance of stock certificates to a person other than the Holder) in respect of the issuance of such stock.  The Holder will be deemed to have become the holder of record of the shares issued upon exercise of this Warrant on the date on which the Warrant was surrendered and payment of the Warrant Price was made, if the shares are indeed issued in the name of and to the Holder, regardless of the date of delivery of the certificate for such shares, except that, if the date of such surrender and payment is a date when the stock transfer books of the Company are closed, the Holder will be deemed to have become the holder of such shares at the close of business on the next succeeding date on which the stock transfer books are open.

12.    Lost, Stolen, Mutilated or Destroyed Warrant.  Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, mutilation or destruction of this Warrant, and in case of loss, theft or destruction, upon the agreement of the Holder to indemnify the Company, or in the case of mutilation, upon surrender and cancellation of this Warrant, the Company will issue a new Warrant of like denomination and tenor as the Warrant so lost, stolen, mutilated or destroyed.

13    Transferability.  In accordance with applicable federal securities laws, this Warrant may be transferred or assigned, in whole or in part, without the prior written consent of the Company.  Such transfer will be registered on the books of the Company maintained for such purpose, upon surrender of this Warrant.  Upon such surrender, the Company will execute and deliver a new Warrant or Warrants in the name of the assignee or assignees and in the denomination specified in such instrument of assignment, and will issue to the assignor a new Warrant evidencing the portion of this Warrant not so assigned, and this Warrant will promptly be cancelled.  A Warrant may be exercised by a new Holder for the purchase of shares of Common Stock without having a new Warrant issued.

14.    Representations and Warranties of Holder.  Holder hereby represents and warrants that:

7

(a)  Purchase Entirely for Own Account.  This Warrant and the Shares issuable upon exercise hereof (collectively, the "Securities") will be acquired for investment for Holder's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and Holder has no present intention of selling, granting any participation in, or otherwise distributing the same.  As of the date hereof, Holder does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participation to any person with respect to any of the Securities.  Holder represents that it has full power and authority to enter into this Warrant.

(b)  Investment Experience.  Holder acknowledges that it is able to protect its own economic interests, can bear the economic risk of its investment and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in the Securities.  Holder also represents it has not been organized for the purpose of acquiring the Securities.

(c)  Accredited Investor.  Holder is an "accredited investor" within the meaning of Rule 501 of Regulation D promulgated under the Securities Act of 1933 (the "Act").

(d)  Restricted Securities.  Holder understands and acknowledges that the Securities are characterized as "restricted securities" under the Act inasmuch as they are being acquired from the Company in a transaction not involving a public offering, and that under the Act such securities may be resold without registration under the Act only in certain limited circumstances.  In this connection, Holder represents that it is familiar with Rule 144 promulgated under the Act and understands the resale limitations imposed thereby and by the Act.

(e)  Further Limitations on Disposition.  Without in any way limiting the representations and warranties set forth above, Holder further agrees not to make any disposition of all or any portion of the Securities unless and until (i) there is then in effect a registration statement under the Act covering such proposed disposition and such disposition in made in accordance with such registration statement, or (ii) (A) such Holder will have notified the Company of the proposed disposition and will have furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and (B) if reasonably requested by the Company, such Holder will have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company and its counsel, that such disposition will not require registration of such shares under the Act.

15.  Applicable Law.  This Warrant will be governed by and construed in accordance with the internal laws of the State of Delaware, without regard to its principles of conflicts of laws.

8

IN WITNESS WHEREOF, the Company's duly authorized officer has executed this Warrant as of the 1st day of May, 2001.

THE LOTTERY CHANNEL, INC.

By: _____
Name:
Title:

The undersigned is executing this Warrant solely for the purposes of Sections 7(b) and 14 hereof, as of the date first written above.

BINGO, INC.

By: _____
Name: DONALD R. CURTIS
Title: DIRECTOR